IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00242-MSK-MEH

TERRI CRANDALL and
JOANN HUBBARD,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO,

    Defendant.

_____

**OPINION AND ORDER DENYING MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant, City and County of Denver ("Denver")'s Motion to Dismiss or in the alternative to Stay **(# 10)**, the Plaintiffs' response **(undocketed, tendered April 18, 2005)**,[1] and Denver's reply **(# 20)** and the Plaintiffs' Motion for Leave **(# 23)** to File a Sur-Reply.[2]

---

[1]The Court granted **(# 19)** the Plaintiffs' Motion to Exceed Page Limits **(# 17)** on their tendered response, but apparently failed to direct the filing of a formal response or docketing of the tendered response. The Court will consider the tendered response as the Plaintiffs' response to the motion and will direct the Clerk of the Court assign a docket number to the tendered response.

[2]Because the Court is sufficiently advised of the parties' positions from the original briefs, the Plaintiff's Motion for Leave to File a Sur-Reply is denied as moot. Based on the Court's cursory review of the tendered sur-reply brief, the arguments raised therein would not alter the Court's analysis of the issues.

**BACKGROUND**

According to the Complaint **(# 1)**, the Plaintiffs are a present and former employee of United Airlines, working in Concourse B of the Denver International Airport ("DIA"). They contend that, as a result of a defective capture system, de-icing fluid used by United Airlines on planes gateside at Concourse B is not sufficiently contained, and instead, seeps into the soil around the Concourse, and ultimately, into the Concourse itself. In addition, the Plaintiffs contend that other design or construction defects in sewer pipes in and around Concourse B have resulted in the leakage of raw sewage into the Concourse. The Plaintiffs allege that they and others have suffered various illnesses as a result of exposure to these substances.

The Complaint alleges three causes of action, all under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*: (i) a claim for injunctive relief against Denver for present and future violations of RCRA, 42 U.S.C. § 6972(a)(1)(A); (ii) a claim for injunctive relief against Denver as a person who is "contributing to the past or present handling . . . of any solid or hazardous waste which may present an imminent or substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)(1)(B); and (iii) a claim for fees and costs under 42 U.S.C. § 6972(e).

Denver moved to dismiss the Complaint or, in the alternative, to stay the litigation pending the outcome of proceedings between the parties in Colorado District Court for the County of Denver, *Crandal v. City and County of Denver*, Case No. 03-cv-5186. Specifically, Denver alleges that: (i) the Plaintiffs fail to state a claim under RCRA because the de-icing fluid and sewage do not constitute "solid wastes," and the discharge does not amount to "open dumping" as defined by the statute; (ii) the Court should abstain from hearing this case on *Younger* grounds,

as there is a pending suit in state court seeking the identical relief; (iii) the Court is barred from hearing the case[3] on *Rooker-Feldman* grounds, as Denver is asserting governmental immunity in the state court action, and issuance of the injunction sought here might effectively nullify any judgment issued on immunity grounds in that case; and (iv) United Airlines is a necessary party who must be either joined or the case dismissed under Fed. R. Civ. P. 19(a).

## ANALYSIS

### A. Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the Complaint as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001), as well as unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such

---

[3]In the alternative, Denver requests a stay of the proceedings under *Rooker-Feldman*, based on the pendency of an interlocutory appeal by Denver of a ruling in the state court case that denied, in part, Denver's defense of governmental immunity.

3

documents is undisputed. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

### B. "Solid waste" and "open dumping" under RCRA

The parties agree that, to sufficiently state either one of their substantive claims under RCRA, the Plaintiffs must state facts alleging that Denver has engaged in the "open dumping" of "solid waste." The Court begins with the arguments pertaining to the definition of "solid waste."

#### 1. "Solid waste"

Turning first to the issue of whether the Plaintiffs have adequately alleged a discharge of "solid waste," that term is defined by RCRA as "any garbage, refuse, sludge . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial [or] commercial . . . operations, . . . but does not include solid or dissolved material in domestic sewage, or . . . industrial discharges which are point sources subject to permits under [the Clean Water Act]." 42 U.S.C. § 6903(27). Denver contends that the "domestic sewage" exemption in the definition precludes the Plaintiffs' claims and that the "point source" exemption precludes claims relating to the de-icing fluid.

##### A. "Domestic sewage"

Denver cites *Comite Pro Rescate de la Salud v. Puerto Rico Aqueduct and Sewer Authority*, 693 F.Supp. 1324, 1328-1331 (D.P.R. 1988) for the proposition that solid wastes otherwise subject to RCRA become exempted "domestic sewage" when they mix with sanitary (i.e. human) wastes in a sewer system. In *Comite Pro Rescate*, the District Court dismissed a RCRA claim based on alleged improper disposal of industrial wastes from a factory under the "domestic sewage" exemption because the industrial wastes commingled in the factory's sewer

4

system with sanitary wastes from toilets in the factory before the mixture eventually leaked into the environment. Relying on an EPA regulation interpreting RCRA, the District Court found that the industrial wastes became exempt "domestic sewage" when they entered the sewer system and mixed with sanitary waste. 693 F. Supp. at 1329, *citing* 40 C.F.R. § 261.4. However, Denver failed to advise the Court that *Comite Pro Rescate* was vacated on appeal on this precise issue.[4] *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority*, 888 F.2d 180, 184 (1st Cir. 1989). Indeed *Comite Pro Rescate* now stands for precisely the opposite proposition.

Reversing the District Court, the First Circuit held that "domestic sewage" means "sewage that, in fact, comes from residences." *Id.* (emphasis in original). It reasoned that although the waste in question was partially composed of sanitary waste from toilets, it was not "domestic sewage" because the source of the sanitary waste was a workplace, not a residence. *Id.* It is clear from the Complaint that the sewage leaking from DIA's sewer system is not residential sewage, and thus, pursuant to the reasoning of *Comite Pro Rescate,* the waste at issue here is not subject to the domestic sewage exception to RCRA's definition of "solid waste."

After acknowledging the reversal of *Comite Pro Rescate* for the first time in its reply brief, Denver's arguments on this issue become confusing. Denver alleges that "[t]here are actually two domestic sewage exclusions in the statutory language," which it identifies as 42 U.S.C. § 6903(27)(a)(1)(i) and (ii). *Docket* # 20 at n. 8 (emphasis in original). The definition in the

---

[4]Although Denver argues in reply that the appellate court opinion is both wrongly decided and distinguishable from this case, such arguments do not relieve Denver's counsel of its ethical obligation to indicate that the authority it relies upon was subsequently vacated. *See* Colo. R. Prof. Conduct 3.3(a)(3).

5

statute, a single paragraph, contains no such subdivisions. Although this argument in Denver's reply brief refers to sections of the United States Code, and speaks of "statutory language" used by "Congress," the statutory citations used by Denver simply do not exist. Perhaps Denver may be thinking of 40 C.F.R. § 261.4(a)(1)(i) and (ii), a portion of the EPA's <u>regulations</u> interpreting Subtitle C of RCRA.[5] *Comite Pro Rescate,* 888 F.2d at 186-87. However, Denver's reliance upon such regulation would be inconsistent with its contention that the parties have agreed that the EPA's Subtitle C regulations were irrelevant to this case. *Docket* # 20 at 3.

Denver goes on to argue that the First Circuit's decision in *Comite Pro Rescate* is distinguishable from this case, because "the [First Circuit] relied on EPA's interpretation of the Subtitle C regulatory definition of solid waste," *Docket* # 20 at 5, whereas hazardous wastes under Subtitle C are not at issue here. However, in *Comite Pro Rescate*, after setting forth its rational for interpreting the <u>statutory</u> definition of "domestic sewage," the First Circuit wrote "[t]he defendants reply to these arguments by pointing to a specific EPA regulation, written in respect to <u>other</u> parts of the RCRA statute." 888 F.2d at 186, *citing* 40 C.F.R. § 261.4 (emphasis in original). Far from "relying" on the Subtitle C regulations, as Denver contends, the First Circuit expressly rejected the argument, precisely because the case did not involve hazardous wastes. 888 F.2d at 186-87 ("We do not accept this argument for two reasons . . . Second, as we

---

[5] Subtitle C of RCRA involves standards for identifying and handing "hazardous waste," a subset of the category of "solid waste." 42 U.S.C. § 6921 *et seq.* In Subtitle C of RCRA, Congress directed the EPA to establish regulations governing the identification and handling of hazardous waste. 42 U.S.C. § 6921. The result were the regulations found at 40 C.F.R part 261. RCRA did not direct the EPA to establish regulations regarding non-hazardous solid wastes, and thus, analysis of claims involving non-hazardous wastes – such as those at issue here – takes place only under RCRA's statutory definitions, not the Subtitle C regulations. *See generally Connecticut Coastal Fisherman's Assn. v. Remmington Arms Co.*, 989 F.2d 1305, 1314-15 (2d Cir. 1993).

6

just mentioned, the definitional regulation applies 'only to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA.'") (emphasis omitted). Because the parties agree that hazardous wastes under Subtitle C are not at issue here, it is difficult to understand why Denver believes that the First Circuit opinion in *Comite Pro Rescate* is distinguishable.[6]

For the foregoing reasons, the Court finds Denver's arguments on the "domestic sewage" issue to be without merit. Although the First Circuit's ruling in *Comite Pro Rescate* is not binding on this Court, its decision persuasively establishes that the "domestic sewage" exception applies only to wastes comprised, at least in part, of residential sanitary waste. Because the Plaintiffs' claims do not entail such residential wastes, their allegations with regard to leaking sewage at DIA are sufficient to fall within the definition of "solid waste" under RCRA.

### B. "Point source"

With regard to de-icing fluid, Denver raises two reasons that such seepage does not constitute "solid waste" under RCRA: (i) Denver's use of the fluid at DIA constitutes a "point source" of discharge regulated by the Clean Water Act and (ii) the fluid is not "discarded or abandoned," because it is used for its intended purpose.

---

[6]Denver's sole remaining argument in its reply brief on this issue is that the EPA's "wet weather discharge" program under the Clean Water Act "effectively superced[es]" the analysis in *Comite Pro Rescate.* However, Denver does not explain precisely how EPA regulations interpreting a completely different statute act to nullify the First Circuit's analysis of RCRA's statutory definition of "domestic sewage."

With regard to the first argument, RCRA's statutory definition of "solid waste" excludes "industrial discharges which are point sources subject to permits under [the Clean Water Act]." 42 U.S.C. § 6903(27). The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, provides a system by which certain regulatory bodies may issue permits regulating a facility's discharge of pollutants into navigable waters. 33 U.S.C. § 1342(a); *see Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005). The focus of regulation under the Clean Water Act is on "point sources" of contamination, defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A point source is "the proximate source from which the pollutant is directly introduced to a destination water body." *Waterkeeper Alliance, Inc. v. U.S. Environmental Protection Agency*, 399 F.3d 486, 510 (2d Cir. 2005).

The crux of the parties' dispute on this issue appears to be whether the seepage of de-icing fluid into Concourse B amounts to a discharge from a "point source" under the Clean Water Act. The Court analyzes this situation mindful of the fact that the case is presented at the pleading stage. Thus, the Court may dismiss the claim relating to de-icing fluid only if there is no set of facts that could be proven in which RCRA could apply to the migration of de-icing fluid described in the Complaint. In the Complaint, the Plaintiffs describe a "deicing fluid collection system along the perimeter of Concourse B." *Docket* # 1 at ¶ 12. However, the "system has never worked and, as a result, fluids used at the Concourse B gates . . . are released directly into the environment," eventually seeping into Concourse B itself. *Id.* The Complaint is tantalizing in its ambiguity. Is the seepage into Concourse B a result of de-icing fluid that somehow avoids the

8

collection system? Does the fluid enter the collection system, but then, due to negligent design or manufacture, escape? Perhaps the system functions exactly as intended, but is inadequate to handle the volume of fluid, resulting in overflows and backups? Because the Court must construe the Complaint in the light most favorable to the Plaintiffs in analyzing a motion to dismiss, it interprets the allegations in the Complaint in the light in which they are least likely to resemble a "point source" under the Clean Water Act.

Doing so, it is clear that, at least in the abstract, the Plaintiffs can allege a release of de-icing fluid that does not fall within the definition of a "point source" under the Clean Water Act. As described above, the *sine qua non* of a point source is that it proximately discharges pollutants into a navigable water. *Waterkeeper Alliance,* 399 F.3d at 510. The Complaint is susceptible to a reading in which the fugitive de-icing fluid <u>never</u> comes into contact with a navigable water, and instead percolates directly into the foundation of Concourse B. *Compare Inland Steel Co. v. E.P.A.*, 901 F.2d 1419, 1424 (7th Cir. 1990) (finding deep "injection wells" subject to RCRA and outside the "point source" exception, where discharges into wells never came into contact with navigable waters). Absent discharge into a navigable water, such a release would not be subject to the permit requirements of the Clean Water Act. *Sierra Club,* 421 F.3d at 1142 (discharge into a navigable water is an essential element of Clean Water Act violation). Thus, the Court declines to dismiss the RCRA claims under the "point source" exemption at this time.

### C. "Discarded"

Although Denver argues whether the de-icing fluid is "discarded" in the context of its discussion of the point source exemption, it is clear that this argument has nothing to do with the exemption of discharges subject to the Clean Water Act. Rather, it is a separate argument based

on the definition of "solid waste" in § 6903(27), which provides that "solid waste" must be "discarded material."

Neither RCRA nor the EPA[7] have generally defined the term "discarded" in § 6903(27). Denver cites to several cases which generally stand for the proposition that materials are not deemed "discarded" under RCRA at the moment they are released into the environment, but rather, they become "discarded" "some time after they have served their intended purpose." *Water Keeper Alliance v. U.S. Department of Defense,* 152 F.Supp.2d 163, 168 (D.P.R. 2001) (fired but unexploded ordinance not "discarded" as of time of firing, intended purpose included impact with ground), *citing No Spray Coalition, Inc. v. City of New York*, 2000 WL 1401458 (S.D.N.Y.2000) (unpublished) (sprayed insecticide not "discarded" upon spraying, intended purpose was to come into contact with mosquitos and their habitat); *see also Long Island Soundkeeper Fund v. N.Y. Athletic Club,* 1996 WL 131863 (S.D.N.Y. 1996) (unpublished) (lead shot and clay targets not "discarded" when used at target range, as coming to rest was part of their intended use), *but see Connecticut Coastal*, 989 F.2d at 1316 (lead shot may not be "discarded" upon firing, but fired shot, left to accumulate, eventually is deemed "discarded"). Of course, it is difficult to imagine that de-icing fluid is serving its "intended purpose" of preventing

---

[7]In its Subtitle C regulations relating to hazardous wastes, the EPA has defined "discarded" material as that which is "abandoned" by means of disposal or burning, that which is accumulated in anticipation of recycling, or that which is "inherently waste-like." 40 C.F.R. § 261.2(a)(2), (b), (c), (d). However, as discussed above, the parties agree that the regulations interpreting hazardous waste in Subtitle C are not applicable here. Even assuming this regulation was applicable, the Court would find that the Plaintiffs have adequately alleged that the de-icing fluid is "discarded" once it drips off planes and eventually soaks into Concourse B. *See Connecticut Coastal*, 989 F.2d at 1316 (lead shot may not be "discarded" upon being fired at a target and falling to the ground, but after some period of dormant accumulation on the ground, it will eventually meet that definition).

icing on plane wings when that fluid is lying on the ground or seeping into Concourse B. The Court need not engage in extended analysis of when the de-icing fluid becomes "discarded," as it is obvious that, in the circumstances presented by the Plaintiffs' claims, the fluid has been "discarded" by the time it comes into contact with the foundation of Concourse B.

Accordingly, the Plaintiffs have adequately alleged that the de-icing fluid is "discarded" and thus, constitutes "solid waste" under RCRA.

### 2. "Open dumping"

As noted earlier, RCRA prohibits "open dumping" of solid waste. 42 U.S.C. § 6945(a). However, it does not define the term "open dumping," but the EPA regulations at 40 C.F.R. part 257 provide some guidance as to what constitutes "open dumping." Denver argues that 40 C.F.R. § 257.1(c)(6) excludes "industrial discharges which are point sources subject to permits under Section 402 of the Clean Water Act" and therefore the Complaint fails to state sufficient facts to allege "open dumping." In other words, it appears that Denver's "open dumping" argument turns on precisely the same language as its argument with regard to the term "point source." Because the Court has concluded that the Plaintiffs have sufficiently alleged a discharge outside of the scope of the Clean Water Act, Denver's "open dumping" argument fails for the same reason.

Thus, Denver's Motion to Dismiss the Plaintiffs' RCRA claims for failure to state a claim under Rule 12(b)(6) is denied.

### C. *Younger* abstention

Denver contends that the Court should abstain from hearing this case pursuant to *Younger v. Harris,* 401 U.S. 37 (1971). Under the *Younger* abstention doctrine, a federal court with

11

subject-matter jurisdiction over a claim may elect to abstain from exercising that jurisdiction if doing so would interfere with an ongoing state proceeding that implicates important state interests.  *D.L. v. Unified School Dist.*, 392 F.3d 1223, 1227-28 (10th Cir. 2004). Abstention under *Younger* is appropriate where three elements exist: (i) the state judicial proceedings are ongoing; (ii) the state proceedings implicate an important state interest; and (iii) the state proceedings offer an adequate opportunity to litigate the federal claims.  *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1204 (10th Cir. 2003).  *Younger* abstention is <u>inappropriate</u> if the federal plaintiff cannot pursue its federal contentions in the state proceeding, either as direct claims or as defenses.  *D.L.*, 392 F.3d at 1229.

Denver explains that the Plaintiffs here are also plaintiffs in a state court action concerning contamination of Concourse B, pending in the Colorado District Court for the County of Denver. In that case, the Plaintiffs assert claims of negligence, negligence *per se*, public nuisance, premises liability, and battery.  They seek both monetary and injunctive relief, including abatement of any environmental contamination of Concourse B and implementation of environmental safeguards.

*Younger* abstention is inappropriate where the federal court has exclusive jurisdiction over a claim.  *Kansas Public Employees Retirement System v. Reimer & Koger Assocs.*, 77 F.3d 1063, 1071 (8th Cir. 1996).  Federal courts have exclusive jurisdiction over claims under RCRA.  42 U.S.C. § 6972(a)(2).  Denver argues that state statutes and recognized torts offer the Plaintiffs the same injunctive relief available to them under RCRA.  However, "[t]he question is not whether there is some proceeding pending in state court that may implicate the same interests as the one from which abstention is demanded; rather, the requirement is of a parallel proceeding, pending at the time the federal court action was filed, in which the plaintiff may raise and have

adjudicated the <u>same claims it seeks to press in federal court</u> and obtain the same relief." *International Fidelity Ins. Co. v. City of New York*, 263 F.Supp.2d 619, 633 (E.D.N.Y. 2003) (emphasis added).  The fact that Colorado law may[8] offer the Plaintiffs opportunities to assert claims similar to their RCRA claims, or to seek relief similar to that sought under RCRA, is not a sufficient basis for the exercise of *Younger* abstention.  *See e.g. Middlesex County Board of Chosen Freeholders v. State of N.J.*, 645 F.Supp. 715, 724 (D.N.J. 1986); *see also Spillane v. Commonwealth Edison Co.*, 291 F.Supp.2d 728, 732 (N.D. Ill. 2003) (exclusive federal jurisdiction over RCRA claims warranted no abstention).

Accordingly, the Court declines to abstain from exercising jurisdiction on *Younger* grounds.

### D.  *Rooker-Feldman*

Denver also contends that the Plaintiffs' claims are subject to the *Rooker-Feldman* doctrine.  The *Rooker-Feldman* doctrine provides that lower federal courts are without subject matter jurisdiction to hear claims actually decided by a state court, or claims that are "inextricably intertwined" with a final state court judgment; *Guttman v. Khalsa*, 401 F.3d 1170, 1173 (10th Cir. 2005); *Crutchfield v. Countrywide Home Loans*, 389 F.3d 1144, 1145 (10th Cir. 2004).  At its essence, the doctrine exists to prevent a party losing in state court from seeking what, in

---

[8]Interestingly, Denver wants this Court to abstain in this case in favor of a proceeding in which Denver has asserted complete governmental immunity under Colorado law.  Such immunity would not likely be available to Denver in a suit under RCRA.  *See* 42 U.S.C. § 6972 (permitting suits against governmental entities, but prohibiting suits against the states as prohibited by the 11th Amendment); *Burnette v. Carothers*, 192 F.3d 52, 58 (2d Cir. 1999).  If this Court were to abstain in favor of the state proceeding, and Denver is ultimately successful in arguing that it is completely immune from the claims in that case, abstention would effectively deprive the Plaintiffs of any opportunity for a hearing on the merits of their claims.

13

substance, would be appellate review of the state judgment in a United States District Court, based on the losing party's claim that the state judgment itself violates the loser's federal rights. *Id.*   In determining whether claims of constitutional violations are "inextricably intertwined" with the state court proceedings, the Court inquires whether the state court judgment caused, actually and proximately, the injury for which the Plaintiffs seek redress.  *Guttman*, 401 F.3d at 1174; *Merrill Lynch Business Financial Services, Inc. v. Nudell*, 363 F.3d 1072, 1076 (10th Cir. 2004).

Here, the "judgment" that Denver alleges is imperiled by this proceeding is a ruling by the Colorado District Court that Denver was entitled to governmental immunity from some portion of the Plaintiffs' claims, based on the Plaintiffs' failure to file a timely Notice of Claim as required by the Colorado Governmental Immunity Act, C.R.S. § 24-10-109.  Although the Colorado legislature describes the Governmental Immunity Act as an extension of the state's sovereign immunity, *see e.g.* C.R.S. § 24-10-102, the immunity that a state enjoys under the 11th Amendment to the Constitution does not extend to its municipal subdivisions, such as the city and country of Denver.  *Board of Trustees v. Garrett*, 531 U.S. 356, 359 (2001).  Eleventh Amendment immunity is the only type of governmental immunity recognized under RCRA. 42 U.S.C. § 6972(a)(2).  Thus, any sovereign immunity enjoyed by Denver under the Governmental Immunity Act in state court is not available to it on RCRA claims in this Court.  Because the state court "judgment" on the issue of governmental immunity has no applicability to the federal claims

in this case, the claims in this case are not "inextricably intertwined" with the state court ruling, and the *Rooker-Feldman* doctrine is inapplicable here.[9]

### E. Joinder of United Airlines

Finally, Denver argues that United Airlines is a necessary party under Fed. R. Civ. P. 19(a), and must either be joined or the case must be dismissed. Rule 19(a) provides for the necessary joinder of parties if: "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

Denver argues that "an injunction issued herein against Denver would have no effect on the entity that is actually responsible for generating the alleged hazardous substance." *Docket #* 13 at 21. As relevant here, the operative provisions of RCRA are found at 42 U.S.C. § 6945(a), which states that "the open dumping of solid waste is prohibited." Denver argues that United Airlines is the entity that actually engages in the Concourse B de-icing operations.

This presents an interesting legal question: which party is actually engaging in "open dumping" prohibited by RCRA – the party discharging the solid waste onto the ground, or the

---

[9]For similar reasons, the Court denies Denver's motion to stay the case pending disposition of its appeal of the state court's immunity ruling. In addition, where appropriately invoked, *Rooker-Feldman* operates to deprive the Court of any subject-matter jurisdiction. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 125 S.Ct. 1517, 15236 (2005). If Denver were correct that the doctrine is applicable here, the Court would lack jurisdiction to proceed at all. In that case, dismissal, not a stay, is the only remedy that can be granted.

party who fails to adequately pick it up? One could argue that United Airlines would also be a suitable Defendant in the case, but that is not the question posed by Rule 19(a). Rather, the question to be answered under Rule 19(a) is whether complete relief under RCRA can be afforded with only Denver as a Defendant, whether United Airlines' interests will be impeded by a judgment against Denver, and whether United Airlines' interests pose a risk of Denver being exposed to inconsistent obligations.

Complete relief under RCRA can certainly be afforded to the parties as presently situated. Denver admits that it is the party ultimately responsible for collection of the de-icing fluid, and thus, a remedy which directs improvement in such collection activities would not directly affect United Airlines. The Plaintiffs are not, as Denver suggests, seeking a judgment that enjoins all de-icing operations at DIA, or even a judgment that enjoins de-icing at Concourse B. Rather, they request only that Denver "investigate and remediate the contamination." *See Docket* # 1 at ¶ 59. Such relief can be afforded in this case without the presence of United Airlines as a party, and thus, United Airlines is not a necessary party under Rule 19(a)(1).

Denver argues that United Airlines has an interest in this case as it is "the primary tenant at Concourse B. [Its] interests would be severely affected by an injunction requiring closure or modification of Concourse B." *Docket* # 13 at 22. Once again, this argument assumes a remedy– "closure or modification of Concourse B" – that has not been requested by the Plaintiffs, and thus, presents little cause for concern at this stage of the litigation. In any event, as described by Denver, United Airlines' interest in the litigation arises from a contract it has with Denver over the use of Concourse B. The possessory interest in Concourse B is only tangentially related to the dispute between the parties here, which relates to the thoroughness of Denver's collection of

16

de-icing fluid. Adopting Denver's argument would dramatically expand the notion of a necessary party under Rule 19(a), deeming practically every entity that has dealings with a defendant to be a necessary party, simply because the outcome of the case might affect how that defendant structures its affairs in the future.[10]  *See e.g. Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 881-82 (9th Cir. 2004) (lessor of event space not a necessary party in action to compel lessee of space to make its event handicapped-accessible, even though judgment against lessee might induce lessee to breach its contract with lessor and seek a more accessible venue). In any event, it is entirely unclear how United Airlines' lease of Concourse B from Denver gives rise to interests that are somehow distinct from those held by Denver itself in this case. *See Ohio Valley Environmental Coalition v. Bulen*, 429 F.3d 493, 504-05 (4th Cir. 2005) (joinder under Rule 19(a) not required where existing parties' interests were identical to interests of non-parties). Denver argues that United Airlines would be entitled to "input on the type of remediation necessary to satisfy Plaintiffs' claims and comport with efficient terminal operations," *Docket* # 20 at 18, but gives no indication as to how United Airlines' interest in "efficient terminal operations" differs from its own. Denver also argues that FAA requirements and other requirements mandate that some de-icing be performed at Concourse B, rather than remotely. This argument is misplaced, however, as the Plaintiffs do not demand cessation of de-icing at Concourse B, but rather, seek only more effective recovery by Denver of the de-icing fluid used there. Thus, the Court finds that United Airlines is not a necessary party under Rule 19(a)(2)(i).

---

[10]For example, Denver's argument would suggest that in a suit brought by a franchisor to revoke the license of a franchisee, all of the franchisee's suppliers would be necessary parties, as the revocation of the franchise license might impair contractual relationships between the franchisee and the suppliers, even though the suppliers have no direct interest in the subject of the litigation – the franchise – itself.

17

Finally, Denver makes an abbreviated argument that it could be subject to "multiple litigation" if United Airlines is not joined. This argument is apparently premised on the notion that, if the remedy in this case will somehow force Denver to substantially curtail operations at Concourse B, Denver will face litigation from United Airlines arising out of the breach of its lease. As stated previously, this argument is based on an erroneous reading of the prayer for relief. Moreover, that fact that the outcome of this case might have collateral consequences leading to future lawsuits is too speculative a proposition to require joinder of United Airlines where it otherwise maintains no direct interest in the subject of this lawsuit.

Accordingly, Denver's motion seeking joinder of United Airlines under Rule 19 is denied.

## CONCLUSION

For the foregoing reasons, Denver's Motion to Dismiss **(# 10)** is **DENIED**. The Plaintiffs' Motion for Leave to File a Sur-Reply Brief **(# 23)** is **DENIED AS MOOT**. The Clerk of the Court shall assign a docket number to the Plaintiff's April 18, 2005 tendered brief in response to the Motion to Dismiss.

Dated this 24th day of February, 2006

                **BY THE COURT:**

                *Marcia S. Krieger*
                _____

                Marcia S. Krieger
                United States District Judge