IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 05-cv-0242-MSK-MEH

TERRI CRANDALL and JOANN HUBBARD,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO
d/b/a The Denver International Airport, a Colorado political
subdivision,

    Defendant.

---

**PLAINTIFFS' BRIEF RE: REASONABLENESS OF UNITED AIR LINES, INC.'S AND GALLAGHER BASSETT SERVICES, INC.'S REQUESTED ATTORNEYS' FEES AND COSTS**

---

Plaintiffs, by and through undersigned counsel and pursuant to this Court's November 2, 2006 Order on Joint Motion of United Air Lines, Inc. ("United") and Gallagher Bassett Services, Inc. ("Gallagher") for Reimbursement of Costs, **[Docket # 182]**, (the "Order"), respectfully submit this brief regarding the reasonableness of the $58,156.81 in attorneys' fees and costs sought by United and Gallagher.

## I. FACTUAL BACKGROUND

In April 2006, Plaintiffs served focused, date-specific subpoenas on United and Gallagher seeking information relating to worker's compensation claims filed by United employees (the "Subpoenas"). During initial "meet and confer" conferences relating to the Subpoenas, Plaintiffs learned of a comprehensive worker's compensation claims database maintained by United/Gallagher. Plaintiffs also learned that this database was searchable by key word and code. Therefore, Plaintiffs began requesting information from United/Gallagher's counsel concerning the database search capabilities with the

goal of simplifying any document production in response to the Subpoenas. Furthermore, in order to address concerns regarding employee confidentiality, Plaintiffs offered to accept production of any files with identifying information redacted.

Despite Plaintiffs' efforts to "meet and confer" regarding the database and confidentiality concerns, however, United and Gallagher filed three motions to quash the Subpoenas on grounds of undue burden and employee privacy. These motions led to a lengthy briefing process culminating in a Court order, which required United/Gallagher to cooperate with Plaintiffs in gathering database information - what Plaintiffs had sought from the start. *May 30, 2006 Order on Motions to Quash Subpoenas Duces Tecum,* [Docket # 101], at 5 ("Motions to Quash Order"). In addition, the Court ordered the parties to negotiate concerning the redaction process proposed initially by Plaintiffs. *Id.* at 3-4. To supervise the document production process, the Court scheduled a series of status reports and status conferences.

Upon receipt of the Motions to Quash Order, Plaintiffs again commenced discussions with United/Gallagher regarding the contents of the database and its search capabilities. During these discussions, Plaintiffs were led to believe that, database notwithstanding, responding to the Subpoenas still would be unduly burdensome to United/Gallagher due to the effort required to access, review and produce the voluminous hard-copy files associated with each database entry. *See, e.g., E-Mail of June 20, 2006 from Amy Arlander to Fritz Ganz,* attached hereto as Exhibit A. Apparently, these files were stored off-site in such a fashion as to make their recovery extremely difficult and expensive. In other words, although the database could identify potentially responsive

2

worker's compensation files, obtaining any claim detail still would require research into the hard-copy records. *Id.*

During these database discussions, Plaintiffs perceived that, every time they asked a question of United/Gallagher's counsel, the response would be slow in coming and, moreover, would serve only to raise additional questions. As a result, Plaintiffs elected to seek a 30(b)(6) deposition of the person most knowledgeable about the database. Plaintiffs believed that it would be easier to obtain database information directly from the source rather than attempting to work through a "middleman."

Shortly after the 30(b)(6) subpoena was served, however, United/Gallagher's counsel came forward with a new and critical piece of information about the database's capabilities. Apparently, the database contained considerably more information than Plaintiffs previously understood. In fact, for each worker's compensation claim, the database contained a searchable file consisting of extensive information and detailed notes about each claim's investigation and resolution. In other words, it now appeared that the contents of the database were sufficiently detailed to eliminate any need to access the hard-copy files.

Based on this information, and after months of wrangling, Plaintiffs finally elicited from United/Gallagher's counsel a simple and straightforward method of identifying the necessary worker's compensation files.[1] Thereafter, the parties quickly reached agreement, Plaintiffs provided appropriate search terms, and United/Gallagher searched the database and produced approximately 180 worker's compensation files

---

[1] Full information regarding the database's search capabilities was slow in coming despite the Court's order directing United/Gallagher "to provide a good faith, educated statement of whether there exists the technological capability of searching the [database] records for a smaller subset of potentially responsive documents." (Motions to Quash Order at 5)

3

(most only a few pages in length) printed directly from the database. In other words, at the end of the day, United/Gallagher's response to the April Subpoenas consisted of little more than a database keyword search and production of a single box of documents.

## II. ARGUMENT

### A. Expenses Incurred as a Result of Efforts to Avoid Production Should Not Be Charged to Plaintiffs

Only a small portion of United/Gallagher's expenses were incurred as a result of efforts to search and print database records, review those records and prepare them for production. Rather, most of the time and effort relating to the Subpoenas arose as a result of United/Gallagher's efforts to avoid production, which led to motions to quash and the need for continued oversight by the Court. It was United/Gallagher's strategic choice to fight production rather than simply producing records and, therefore, Plaintiffs should not be charged for these efforts. *See, e.g.,* F.R.C.P. 45(c)(2)(B) (authorizing cost shifting only for expenses relating to the "inspection and copying" arising from a subpoena); *Cantaline v. Raymark Indus., Inc.,* 103 F.R.D. 447, 453 (S.D. Fla. 1984) (refusing to shift costs incurred by a third-party in connection with photocopying a duplicate set of produced documents for its own use because this cost was "not a cost of producing the discovery items"). In fact, Plaintiffs should be given a credit, or some form of equitable consideration, for the time and effort they were forced to expend in response to United/Gallagher's tactics.[2]

---

[2] As discussed in Plaintiffs' Response in Opposition to United's and Gallagher's Joint Motion for Reimbursement of Attorneys' Fees and Costs, [Docket # 165], ("Plaintiffs' Opposition"), United/Gallagher is closely aligned with the Defendant in this action, the City and County of Denver, Colorado (the "City") in opposing this lawsuit. *Id.* at 4-6. In fact, the City and United are parties to a "Joint Defense and Common Legal Interest Agreement." *Id.* As a result, United/Gallagher is not a typical disinterested party who, in response to a subpoena, could simply produce the records quickly and efficiently. Instead, United/Gallagher's interest in the litigation caused it to engage in litigation tactics designed to reduce the

4

Therefore, at a minimum, Plaintiffs submit they should not be charged for the following: 1) expenses relating to the Court's supervision of the production process, which was necessitated by United/Gallagher's motions to quash, *i.e.*, the preparation of status reports and participation in status conferences; 2) expenses relating to the 30(b)(6) deposition noticed by Plaintiffs in order to gather information about the searchability of the database that, for whatever reason, could not be obtained directly from United/Gallagher's counsel; and 3) expenses relating to the agreed protective order entered as an accommodation to United/Gallagher.

**B.  Fee-Shifting Considerations Weigh in Favor of Limiting the Expenses Charged to Plaintiffs**

Although the Court has directed Plaintiffs to "not reargue [United/Gallagher's] entitlement to some level of costs and fees," (Order at 3), Plaintiffs submit that the factors considered by the Court in making this initial expense-shifting determination also are relevant to determining the final amount of the award. In other words, as discussed in detail in Plaintiffs' Opposition, any award to United/Gallagher should be tempered to the extent of United/Gallagher's interest in the outcome of this litigation, which is demonstrated by its "Joint Defense and Common Legal Interest Agreement" with the City. Therefore, even assuming some level of expense-shifting is appropriate, the ultimate award should be reduced substantially to reflect United/Gallagher's interested-party status.

Similarly, also as discussed in Plaintiffs' Opposition, the Court, in making its award, should consider "whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance." *In re Honeywell*

---

scope of information ultimately provided to Plaintiffs. The costs of such tactics should not be borne by Plaintiffs.

*Intern'l, Inc. Securities Litig.*, 230 F.R.D. 293, 302-303 (S.D.N.Y. 2003) citing *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 177 (D.D.C. 1998). Given United's $17 billion in annual revenues, it is much more capable of absorbing litigation expenses – a necessary cost of doing business – than Plaintiffs. Moreover, Plaintiffs are proceeding on behalf of the federal government as private attorneys general and, therefore, are fulfilling the public policy goals of the Resource Conservation and Recover Act. These factors, particularly in conjunction with United/Gallagher's interested-party status, support a significant reduction in the ultimate fee/cost award against Plaintiffs.

Below, Plaintiffs discuss the two sets of invoices underlying United/Gallagher's fee request. The invoices consist of June 2006 and July 2006 bills for United, attached as Exhibits B and C, as well as June 2006 and July 2006 bills for Gallagher, attached as Exhibits D and E. As requested by the Court in its Order, United/Gallagher provided Plaintiffs with a summary of these invoices, which is attached hereto as Exhibit F. In addition, Plaintiffs have prepared their own summary, which provides a more detailed, invoice-specific breakdown and is attached hereto as Exhibit G.

### C. United Invoices

The total amount of attorneys' fees and costs represented by the United June and July 2006 invoices is $4,112.80. As an initial matter, Plaintiffs submit that none of these expenses should be shifted because they all relate to United's unfinished production pursuant to Plaintiffs' earlier subpoena served in October 2005. As discussed in Plaintiffs' Opposition, and as apparently recognized by the Court, (Order at 1-2), United, by failing to raise the cost issue and allow Plaintiffs to take such costs into consideration, waived cost-shifting in connection with the October 2005 subpoena.

In addition, for the reasons discussed above, Plaintiffs request deductions of those expenses relating to preparation of status reports and participation in status conferences ($337.50) and complying with Plaintiffs' 30(b)(6) notice ($243.75). For the Court's convenience, Plaintiffs' have designated on each invoice those entries apparently relating to the foregoing tasks. In particular, time entries relating to status reports/conferences are denominated with an "SR" and entries relating to the 30(b)(6) notice are denominated "30b6." In addition, all time entries relating to the agreed protective order are denominated "PO."

Finally, Plaintiffs would point out that the attorneys' fees billed in these invoices were incurred by three attorneys, a senior partner and two mid-level associates. In the Order, the Court indicated that it was "quite concerned with the level of attorney involvement (and the concomitant amount of attorney's fees) in this matter." (Order at 2).[3] Plaintiffs respectfully submit that the United invoices should be reduced to reflect the inefficiencies inherent in having three different attorneys dealing with the same issues. Moreover, Plaintiffs question the necessity of significant senior partner involvement in a routine document production.

**D.     Gallagher Invoices**

The total amount of attorneys' fees and costs represented by the Gallagher June and July 2006 invoices is $54,044.11. As an initial matter, Plaintiffs would point out that these June and July invoices actually represent two different time periods – the time period before and the time period after Gallagher commenced its efforts to mine its

---

[3] Overall, of the $57,266.25 in attorneys' fees that United/Gallagher seeks to shift to Plaintiffs, only $3,575 – or, approximately, 6 percent – was incurred by non-attorney paralegals.

database, print and produce its box of worker's compensation files in response to the Subpoena.

As described above, prior to Gallagher's actual production of database documents, Plaintiffs spent considerable time responding to Gallagher's attempts to avoid production. Finally, Plaintiffs learned that a simple key-word search would be sufficient and, thereafter, on July 7, 2006, provided Gallagher with a list of appropriate search terms. *E-Mail of July 7, 2006 from Fritz Ganz to Carolyn Mitchell*, attached hereto as Exhibit H. After this, Gallagher's actual production of documents was accomplished in approximately two weeks.

The expense incurred by Gallagher prior to its actual production efforts consisted primarily of attorney (not paralegal or clerk) time and was devoted almost entirely to: 1) status reports and status conferences; 2) the protective order; and 3) Plaintiffs' 30(b)(6) deposition notice. In addition, as discussed above, Gallagher was less than forthcoming about the database's search capabilities until the noticed 30(b)(6) deposition. Only then did Gallagher fully reveal the database's capabilities, which allowed Plaintiffs to provide search terms. Simply stated, all of Gallagher's pre-production expenses were incurred as a result of Gallagher's attempts to avoid production and/or failures to provide complete information about the database. None resulted from actual production efforts.

Again, Plaintiffs submit that engaging in production-avoidance tactics was Gallagher's choice and not something for which Plaintiffs should be charged. F.R.C.P. 45(c)(2)(B) (authorizing cost shifting only for expenses relating to the "inspection and copying" arising from a subpoena). Gallagher only started searching its database and producing documents after Plaintiffs provided search terms on July 7. The time billed by

Gallagher as a result of production avoidance efforts prior to this date amounts to $31,396.25. Plaintiffs submit that none of these expenses are recoverable.

Therefore, the starting point for awarding attorneys' fees and costs should be the amount of $22,091.25, which was the amount incurred after Gallagher actually commenced production efforts. From this, and as discussed above, Plaintiffs respectfully request deductions for additional expenses relating to status reports/status conferences ($2,758.75) and expenses relating to the agreed protective order ($3,026.50).

Finally, the Court, in its Order, already has stated that it will "need substantial justification for the extensive attorney and paralegal involvement expended in connection with the actual document production." (Order at 2). Plaintiffs submit that the post-July 7 time billed in connection with the actual document production, *i.e.*, the search of the database and printing of one box of records, apparently was performed primarily by attorneys. In fact, all of the production-related expenses Gallagher seeks to shift were incurred by attorneys. Moreover, the production involved three different attorneys, which likely resulted in numerous inefficiencies. Therefore, Plaintiffs request a further reduction in the production-related attorneys' fees and costs Gallagher seeks to shift.

### III. CONCLUSION

WHEREFORE, Plaintiffs respectfully request the Court to limit substantially the attorneys' fees and costs awarded to United and Gallagher as described herein.

RESPECTFULLY SUBMITTED this 1st day of December 2006.

                                     s/ Brian D. Gonzales
John D. Fognani, Esq.
Brian D. Gonzales, Esq.
Fritz W. Ganz, Esq.
FOGNANI & FAUGHT, PLLC
1700 Lincoln Street, Suite 2222
Denver, CO 80203
(303) 382-6200

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December 2006, a true and correct copy of the foregoing **PLAINTIFFS' BRIEF RE: REASONABLENESS OF UNITED AIR LINES, INC.'S AND GALLAGHER BASSETT SERVICES, INC.'S REQUESTED ATTORNEYS' FEES AND COSTS** was electronically filed via ECF with the U.S. District Court for the District of Colorado and served electronically on the following:

Chris A. Mattison, Esq.
Andrew J. Carafelli, Esq.
Hall & Evans, LLC
1125 Seventeenth Street, Suite 600
Denver, CO 80202

Stephen D. Gurr, Esq.
Amy E. Arlander, Esq.
Carolyn J. Mitchell, Esq.
1515 Arapahoe Street
Tower 1, Suite 1600
Denver, Colorado 80202

                                          s/ Sonja Beamon